### INTERNATIONAL DERRICK & EQUIPMENT CO. v. BUXBAUM.

#### Civ. No. 10933.

United States District Court
E. D. Pennsylvania.

March 19, 1953.

952

Rawle & Henderson, Philadelphia, Pa., for plaintiff.

Alexander F. Barbieri, Philadelphia, Pa., for defendant.

FOLLMER, District Judge.

In this action plaintiff seeks to recover damages in the sum of $4,365.48 resulting from the alleged negligent performance of services undertaken by defendant in connection with the installation of an antenna mast at Radio Station WTOA, operated by Mercer Broadcasting Company at Trenton, New Jersey. The case was tried to the Court without a jury.

On the evidence, the files and records in the case, the briefs and arguments of counsel, and on due consideration, the Court makes the following Findings of Fact, Conclusions of Law, and Order for judgment:

### Findings of Fact

1. Plaintiff, International Derrick and Equipment Company, is an Ohio corporation. Defendant, Henry R. Buxbaum, is a citizen of Pennsylvania, and was at the times material to this suit engaged in business under the name and style of Tower Erection Company.

2. The plaintiff contracted to erect a metal tower for broadcasting purposes on the premises of Mercer Broadcasting Company in Trenton, New Jersey, and to mount an antenna mast on the tower. The supporting tower when completed was 265 feet in height, and the antenna mast which was to be raised to the top of the tower was 65 feet in length, and weighed approximately 2,000 pounds.

3. The new antenna mast was delivered to the premises of the broadcasting company by the manufacturer. It was placed on supports at the base of the tower a few feet from the ground for the purpose of fitting the mast with the necessary elements and equipment, which was carried out by the engineers of the broadcasting company.

4. Plaintiff entered into a subcontract with Henry R. Buxbaum, trading as Tower Erection Company, whereby Mr. Buxbaum was to furnish the necessary equipment and services to raise the antenna mast to the top of the supporting tower. Tower Erection Company was engaged in the business of erecting broadcasting antenna equipment, and was experienced in the specialized type of operation which it undertook to perform.

5. On April 15, 1948, Mr. Buxbaum and his employees brought their lifting equipment to the premises of the broadcasting company for the purpose of raising the mast.

6. The defendant's employees attached their "gin pole" to the top of the supporting tower. This pole was constructed of tubular steel in four sections fitted together to form a vertical support. It was approximately 60 feet long when assembled, and projected 26 to 28 feet above the top of the base tower. It was fitted at the top with a pad eye on one side to which were secured four wire cable guys extending to the ground on all four sides of the tower. These guys were equipped with blocks to permit their adjustment to any desired degree of tension. Opposite the point where the guys were attached to the gin pole, there was another pad eye which held the snatch block for the lifting cable. The lifting cable was secured at one end to the

antenna mast and at the other end to a truck winch which was part of defendant's equipment.

7. During the lifting operation, the weather was clear and there was very little wind.

8. The defendant's employees under the personal supervision of Mr. Buxbaum and the manager and chief engineer of the broadcasting company attached the lifting cable to the antenna mast a few feet above its midpoint, so that it could be raised in a position of approximately a 45-degree angle with the ground.

9. When the cable had been attached to the mast to the satisfaction of defendant from the standpoint of the lifting, and to the satisfaction of the broadcasting company's engineer from the standpoint of the protection of the antenna elements from possible damage from the cable, defendant directed that a short lift or "strain" be taken on the winch. This raised the upper end of the mast several feet off the supports where it had been resting. At this time, the gin pole bent over as much as 5 feet.

10. Defendant directed his employees to lift the lower end of the mast so that it could be moved to another position with reference to the foot of the tower, and then directed the winchman to take another strain on the lifting cable.

11. While the winch was making the second lift, and the upper end of the antenna mast was 15 to 20 feet off the ground, the gin pole bent over and kept on bending, causing the mast to fall to the ground, with a part of the mast resting on the bed of the winch truck.

12. Inspection of the guy wires and lifting cable after the accident disclosed that none of the defendant's lifting equipment had broken or become damaged except the metal gin pole, which remained bent over at an angle of about 45 degrees.

13. Upon due inspection of the damaged antenna mast and its equipment by the engineers of the broadcasting company and the representatives of the manufacturer, it was found to have been damaged beyond repair and it was only fit for salvage.

14. The damaged mast was returned to the manufacturer for salvage, and a new mast of the same type was delivered to the broadcasting company and in due course it was safely raised and erected by the defendant.

15. The cost of returning the damaged mast, obtaining a new mast, and delivering it to the broadcasting company, less due credit for salvage, amounted to the net sum of $4,365.48.

16. Plaintiff, as general contractor, paid the aforesaid sum of $4,365.48 to the manufacturer. This sum properly represents the plaintiff's loss due to the accident.

17. By reason of plaintiff's contract with Mercer Broadcasting Company, the plaintiff was primarily responsible for the performance of the erecting operation.

18. Plaintiff has failed to establish the cause for the failure of the gin pole, and has failed to establish that its use was negligent.

19. Defendant was not a bailee of the damaged antenna mast, and was under no special duty of care other than to employ the usual and customary equipment and procedures generally found by experience in the erecting business to be standard and safe.

20. Plaintiff has failed to meet its burden to prove that the damage was occasioned through negligence on the part of the defendant.

21. The defendant is found to be free of any fault for which he could be required to respond to the plaintiff in damages.

## Discussion

The trial developed two issues for determination by the Court, to wit:

(a) Whether the radio tower was in the sole and exclusive possession of the defendant at the time of the accident; and,

(b) Whether the accident was caused by the negligence of the defendant, or his agents, servants or employees.

The testimony clearly demonstrated that the antenna mast was owned by Mercer Broadcasting Company, and was in its possession. It was delivered to the premises of the broadcasting company by the manu-

facturer and it stayed there. The engineers of the broadcasting company fitted it with the necessary elements and equipment, and stood by while defendant, plaintiff's subcontractor, proceeded with the erection. Defendant's sole job was to place the broadcasting company's antenna mast on the broadcasting company's tower which was erected on the broadcasting company's premises. As in Duhrkop Oven Co. v. Tormay, 3 Cir., 9 F.2d 281, defendant was simply operating under a contract to erect an antenna mast. It is crystal clear that under the facts of the case no bailment of the antenna mast was intended or created between the broadcasting company and plaintiff, the general contractor, and obviously the relation of bailor and bailee as between the broadcasting company and defendant could not be created by the subcontract entered into between plaintiff and defendant. Accordingly, no further consideration need be given to this phase of the case.

Defendant undertook the responsibility of erecting this antenna mast atop the tower constructed by the plaintiff. The broadcasting company, the owner, stood by, in the persons of its manager and chief engineer, to make sure that nothing was done in regard to the placing of the lifting cables around the mast or in raising it which would be likely to endanger the mast itself or the equipment which they had installed. The choice of equipment used, the timing, and the various details incident to the actual erection was defendant's sole responsibility.[1]

The gin pole selected by defendant for use in the erecting operation was 58 to 60 feet in length and made of tubular steel. Defendant also used a standard power winch and engine of a one and one-half ton Ford truck. The winch had a hoisting power of 5000 pounds, although defendant testified that he had actually used it for 7500 pounds. The antenna equipment weighed approximately 1800 to 2000 pounds.

Defendant describes the final operation as follows:

"Very little wind, clear and sunshiny at the time. We had spent practically all morning collecting our rigging, hooking on the antenna, and we knocked off for lunch, with the intention of starting the antenna right after lunch. We came back after lunch, took a strain with the power winch, tied on our tag lines in order to hold the antenna away from the tower, and then we took a strain on the antenna, lifting it up almost to a vertical position. I would say the tip end was fifteen or twenty feet above the ground.

"Two of my iron workers then took hold of the lower end of the section and tried to walk it closer to the tower. It became heavy then, we had to take another strain. It was during this second strain that the pole started bending. It kept going and didn't stop. We all ran."

The mast, which had been raised to the point where the top was about 15 or 20 feet from the ground, fell down and part of it struck the bed of the winch truck. After the accident the gin pole was bent over at an angle of about 45 degrees. An inspection by General Electric Company's (the manufacturer) field engineer developed that the mast was damaged beyond repairs. The mast was then returned to the manufacturer for salvage and a new mast delivered to the broadcasting company, which with the aid of a wooden gin pole was erected by defendant without incident.

Defendant testified, without contradiction, that the tubular steel gin pole which failed in this operation had been used by him successfully on other jobs, and had been subjected to greater strain and without supporting guys, such as he had used in this situation. He further testified that he had checked all the guys, that there were no defects, that the sway was in normal limits, and nothing in the operation to show any departure from normal and safe procedures.

In rebuttal, plaintiff produced as an expert Atkinson, who defendant contends is nothing more than a steeple jack. Atkinson testified that he had been engaged as a steeple jack since 1914; that this work

1. Cf. Shaw v. Monessen Southwestern Railway Co., 3 Cir., 200 F.2d 841.

involves high structures, high aerials, tops of buildings, masts and steeples, and stacks; that he has placed many antenna masts on towers, although he has never done tower erection. In answer to a hypothetical question, Atkinson found considerable fault with defendant's operation. He was of the opinion that the gin pole did not extend a sufficient distance above the tower; he criticized the fastening of guy lines to one point as "shoemaker rigging;" he stated a strong preference for wooden gin poles, indicating that he had no experience with steel gin poles and did not know what was meant by a "steel rigger."

Defendant gave a convincing step by step account of the various movements involved in the erection operation. He testified, without contradiction, that the gin pole which failed on April 15, 1948, had been used by him on other jobs, in the same manner and with complete success, with greater strain and without supporting guys. For instance, on the WCAU job on top of the Philadelphia Savings Fund Society Building in Philadelphia, the weights erected with this gin pole were 2700 pounds each, two of them, whereas the weight in the instant case was only between 1800 and 2000 pounds. He stated, furthermore, that this sectioned pole was of the same length on that job, with the same extension above the top of the tower and the same sway of five feet, and he had no trouble, although no guys were used on the gin pole; that he had checked all of the guys and there were no defects, the sway was in normal limits, and on cross-examination no testimony was elicited to show any departure from normal and safe procedure.

I feel that plaintiff has failed to meet its burden of affirmatively proving negligence on the part of the defendant.

### Conclusions of Law

1. The parties are properly before the Court, and the Court has obtained jurisdiction of the parties and the subject matter of this suit.

2. The defendant was an independent contractor for the purpose of lifting the antenna mast on the day of the accident, and the mast was not in his possession as a bailee when the damage occurred.

3. The plaintiff failed to meet its burden of proof to establish that the plaintiff was damaged through negligence on the part of the defendant, his agents, servants, or employees.

4. Under all of the evidence, the verdict must be for the defendant.